Mel M. Marin
P.O. Box 1654
Hermitage, PA 16148

Respondent
*Pro Se*

7 April 2014

# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

1:14-CV-669

| | | |
|---|---|---|
| **IN RE: NOMINATION PETITION OF MEL M. MARIN** FOR THE DEMOCRATIC NOMINATION FOR U.S. REPRESENTATIVE FROM THE 3RD CONGRESSIONAL DISTRICT | ) ) ) ) ) ) ) ) ) ) | Commonwealth 174-MD-2014 **NOTICE OF REMOVAL** TO FEDERAL COURT OF OBJECTOR'S ACTION AGAINST THE NOMINATION OF THIS RESPONDENT ( 28 U.S.C. §§ 1441, 1446(b) ) AND DEMAND FOR JURY |

An original action was filed naming this Respondent as the only defending party in the Commonwealth Court on March 18, 2014, and served on Respondent on April 1, 2014 objecting to the validity of Respondent's nomination to U.S. Congress on the grounds, that (1) Respondent fails the state's rule that he be a resident of the congressional district which adds to and changes Article I, Section 2, Clause 2 of the Constitution of the United States, and (2) the process provided by 25 P.S. §2937 is void "as applied" under the 1st and 14th Amendments, since they implicate federal law and that allows removal within 30 days to this court, as in Tex. Democratic Party v. Benkiser, 458 F.3d 582, 589 [10](5th Cir. 2006)(following removal to federal court on the basis of a state residency rule that conflicts with the U.S. Constitution and giving the court federal question jurisdiction, Tom DeLay is not ineligible to be a congressman because he is not a resident of the state).

Because Respondent challenges a state statute and the claims are not wholly insubstantial, Respondent suggests appointment of a three-judge panel for legal issues, under

the rule in Goosby v. Osser, 409 U.S. 512, 518, 93 S.Ct. 854, 858, 35 L.Ed.2d 36, 42 (1972).

Respondent seeks a jury for fact issues and those of mixed fact and law.

DATED: April 7, 2014

**CERTIFICATE OF SERVICE**

Respondent declares under penalty of perjury that on the date below he provided this notice by hand to the Clerk of the Pennsylvania Commonwealth Court and mailed this Removal Notice to the following by First Class U.S. Mail :

Pascal, Charles Anthony
402 Grant Ave
Leechburg, PA 15656

Pennsylvania Attorney General
Strawberry Square, 16th Floor,
Harrisburg, Pennsylvania 17120

This notice is verified as based on personal knowledge of this petitioner, and may be subject to the penalties of 18 Pa. C.S. §4904 relating to unsworn falsification to authorities.

DATED: April 7, 2014

[signature]

Mel M. Marin
P.O. Box 1654
Hermitage, PA 16148

Respondent
*Pro Se*

7 April 2014

# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: NOMINATION PETITION OF MEL M. MARIN** FOR THE DEMOCRATIC NOMINATION FOR U.S. REPRESENTATIVE FROM THE 3RD CONGRESSIONAL DISTRICT | ) | **NOTICE OF AND MOTION** FOR DECLARATORY JUDGMENT THAT 25 P.S. § 2937 IS UNCONSTITUTIONAL AS APPLIED AND FOR INJUNCTION AGAINST THE SECRETARY OF THE STATE CAROL AICHELE TO PREVENT REMOVAL OF RESPONDENT FROM THE BALLOT FOR MAY 20, 2014 |

Respondent moves as captioned, and submits in support the attached Memorandum of Law from the prior court, and verifies the representations of fact asserted in the same Memorandum. Clark v. City of Lakewood, 259 F.3d 996, 1007 [20](9th Cir. 2001)("If a plaintiff has standing to seek injunctive relief, the plaintiff also has standing to seek a declaratory judgment").

DATED: April 7, 2014

[signature]

Mel M. Marin
P.O. Box 1654
Hermitage, PA 16148

Respondent
*Pro Se*

7 April 2014

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: NOMINATION PETITION OF MEL M. MARIN** FOR THE DEMOCRATIC NOMINATION FOR U.S. REPRESENTATIVE FROM THE 3RD CONGRESSIONAL DISTRICT | ) ) ) ) ) ) ) | Civil 174-MD-2014<br><br>**MEMORANDUM OF LAW** TO QUASH OR DISMISS OBJECTOR'S ACTION AGAINST THE NOMINATION OF THIS RESPONDENT |

## COUNT 1: THE TABLE OF OBJECTIONS IS INADEQUATE

### Addressing The 600 Name Objection First

Objector admits in his Objection that over 1,200 signatures were collected by Respondent and that only 1,000 good ones are required.

Objector appears to make a "global" objection that about 600 signatures were in the "handwriting of another" and also makes random objections to another 100 or so.

If the 600 objections are invalid, then the first count must fail since Respondent would still have enough good signatures even if the random objections to the other 100 were all fair and correct objections. So Respondent addresses the 600 first.

Respondent moves on the basis of the issues of (a) specificity of objection, and (b) time for Respondent to prepare a fair defense. Due process requires both, not just one.

### A Supreme Court Case Bars Amendment After The First Objections

The first case is Petition of Bishop, 525 Pa. 199, 529 A.2d 860 (1990) (failure to make specific objections by 7 day deadline after the Nomination Petition is first submitted allows no

right to amend to be more specific after the 7 day deadline).

The case was rooted in a rule of fairness to give respondents time to prepare a defense:

> [T]he allegations must set forth the specific grounds of invalidity so as to sufficiently advise the proposed candidate of the errors in his nomination petitions so that he is in a position to present any defense he may have to such allegations".

Petition of Bishop, 525 Pa. 199, at 204.

That case explains that if the Objector wishes to amend and add other objections or to clarify, he cannot do so because he had to have done so at the outset in order to give Respondent fair time to prepare a defense.

That controls the present case. Respondent Marin knew *something* was objected-to but he did not know the details. So Marin sought *in forma pauperis* standing as soon as he knew about the objections. He did not delay. He asked the court to waive costs for and subpoena *recent* state records to match those signatures on the nomination form in the event the old signatures from decades earlier in the county elections offices changed due to physical problems like stroke, heart attack, muscle weakness and vision loss that many of the signers had.

Unfortunately, when Marin finally received the objections and studied them, the basis of the objections to the 600 signatures "in the hand of another" was not clear. The Objector *did* list the names of challenged signatures as Bishop, supra, requires, but only gave a one-line topic which the court clerk supplied for Table of Objections, for those 600 signatures: "In The Hand of Another" but failed to explain what that meant. The court then issued a scheduling order for the Objector to provide Respondent with more explanation so that Respondent could address the objections and describe how Respondent would rehabilitate questionable signatures. But the Objector failed to explain anything.

Therefore, Respondent Marin could only guess that the Objector alleges that the signatures were forgeries since that is what "in the hand of another" means according to the Supreme Court in Bishop, supra, and Marin re-doubled his efforts within one day of receiving the objections to obtain subpoenas of recent state records of the signatures. He then sent them and moved to continue the trial date to give the state offices time to produce the recent records since no one can copy 600 records in the few days left before the trial on the matter. The Objector opposed it and on that basis this court denied. Thus, because the initial filing was not clear, and because Objector refused to make it clear on order of this court, and because Objector refused to allow the time for a fair defense, the element of fairness should bar the objections. Bishop, supra, was not just a case about the degree of specificity of objection. It was also a case protecting a fair time for a response.

**This Court Provided On - Point Guidance For Disabled Signers**

Moreover, a case from this court is on-point, because it went further than Bishop, supra, and held that information collected from partially disabled seniors need not be in the hand of the signor if that signor is disabled or weak, or injured, or needs help, and required an objector challenging the sufficiency of signatures on the basis of "In The Hand Of Another" to allege in

the first filing that none of the signors were old or weak or disabled to avoid waiving the entire objection. Petition to Set Aside Nomination of Fitzpatrick, 822 A.2d 867, 870 [1] (Pa. Cmwlth. 2003)(failure of the challenger to argue within 7 days of the nomination that the signers were not disabled or otherwise unable to complete all of the information lines themselves, waives that objection and quashes).

Since that is an express exception to the normal rule requiring the signer print his additional information, it must also be an exception that prevents a challenge to the signature itself:

> **The Objectors also argue that the signers did not complete the required information in accordance with section 908 of the Election Code, 25 P.S. § 2868. However, as indicated above, federal law mandates that the rights of the disabled be preserved and facilitated.**
>
> * * *
>
> Smith, being familiar with the signers, knew that they would have problems writing their addresses and occupations on the Nomination Petition, (Findings of Fact, Nos. 7-8); and (4) **it was obviously difficult for many signers to write their own names on the Nomination Petition,** (Findings of Fact, No. 9). These findings support the trial court's conclusion that the signers required assistance "so as not to disenfranchise them from the electoral process." Accordingly, we affirm.

Petition to Set Aside Nomination of Fitzpatrick, 822 A.2d 867, 870 (Pa. Cmwlth. 2003).

Here, the Objector here *failed* to allege that the 600 were *not* disabled or needed help, and failed to explain why not after this court ordered the Objector to be more specific and, therefore, according to Bishop and Fitzpatrick, suprae, cannot come now and contest Marin's explanation that the 600 were disabled or weak from age and their signatures changed or that they needed help with other information because of stroke, cataracts, and other problems, because that argument was waived:

> The Objectors argue that the trial court erred in denying their petition to set aside Fitzpatrick's Nomination Petition because . . . (4) **the signers were not disabled per se and did not request accommodation. However, the Objectors failed to raise these issues within seven days of the last day for filing a nomination petition, as required** by section 977 of the Pennsylvania Election Code (Election Code), Act of June 3, 1937, P.L. 1333, as amended, 25 P.S. § 2937. Therefore, these matters are waived.

Fitzpatrick, id.

In Fitzpatrick, supra, the objection was *not* "In The Hand Of Another" as in the present case, but alleged there that boxes of *printing* were not complete because the signers did not print their addresses and dates and the candidate did so to help them, since the signers were partially disabled or old or otherwise needed that help. Since that case allowed a candidate to complete the printed boxes if the signers had problems, then surely the same rule must apply if the candidate helped the signers to sign their own names as the present Objector may be alleging. But since this Objector did not make the allegation in his Objection that the signers were *not* in

need of that help, he cannot amend and raise it and argue it now. He waived that entire argument against all 600 signers.

**The Objector Comes With Unclean Hands**

But it is worse.

The Objector did not just fail to deny in his initial filing that disability is a valid defense or that signers needed help for any other reason, and he did not just fail to follow this court's scheduling order to explain more specifically what he means with the general headings in the Table of Objections.

Instead, he actually executed a litigation strategy to refuse to be specific so the Respondent cannot know exactly what he means. And the body of his Objection is no more detailed than the Table of Objections. It gives only a cursory one line topic

Moreover, he boldly misled the public and the Respondent about the bases of his objections in order to create confusion to prevent Respondent from knowing what the specifics are, so Respondent Marin could not have a chance to create a defense. The Objector appears to have explained in a public record published in the week after the filing of the Objection in March 2014 that the challenge had nothing do so with the validity of the signatures at all, nor in whose hand they were made, but that there were *duplicate* signatures. See Exhibit A. Witnesses have been subpoenaed to verify that the Objector did, in fact make those representations intending that they be published so Respondent would be "thrown off", and that they were misleading so the Objector would have an unfair advantage over Respondent . It is for the trier of fact in this court to determine that is true.

Respondent submits, therefore, that the publication was intended to mislead so that Respondent does *not* know the specifics of what is challenged.

Thus, the Objector used a deliberate strategy of deceit to prevent Respondent from preparing fully and fairly for trial and, therefore, comes with unclean hands and that alone prevents this court from allowing the objections. The entire 600 name global challenge must fail as a matter of due process.

**COUNT 2: FALSE AFFIDAVIT VIOLATING STATE RESIDENCY LAW**

**The Objection Is Not Material**

Objector then accuses Respondent of fraud because he said he was a resident of Sharon City and a registered voter there, but was not. This appears to be based on the state rule that a candidate for Congress must be a resident of his district to run for Congress, conflicting with federal law.

Respondent is prepared to submit records from others showing his affidavit was true.

However, the rule is only available if the misstatement is *material* so that proof by Marin of his residency is not necessary since neither residency nor status as elector in the county is a material element in candidate qualification for federal office.

The plain words of any statute must be followed if they are clear. U.S. v. James, 106 S. Ct. 3116, 92 L. Ed. 2d 483 (1986). The plain words of this state rule require that false facts in an affidavit be material to the election proceeding and that the true statement would affect qualification for office: "If the objections relate to *material* errors or defects apparent on the face of the nomination petition or paper . . ..". Petition of Pippy, 711 A. 2d 1048, 1050 (Pa. Cmwlth. 1998)(emphasis added).

Neither a candidate, nor a signature collector for *federal office* need be a resident of the district or the state or even a registered voter.

> Section 909 of the Pennsylvania Election Code (Election Code), Act of June 3, 1937, P.L. 1333, as amended, 25 P.S. § 2869, requires that **a circulation be a qualified elector duly registered and enrolled as a member of the political district referred to in the petition. However, in Morrill v. Weaver, 224 F.Supp.2d 882 (E.D.Pa.2002), the U.S. District Court held that this residency requirement is unconstitutional. The court stated that the requirement severely burdens protected First Amendment rights of free political expression and association, and the requirement is not narrowly tailored to serve a compelling state interest.**

Fitzpatrick, supra, at [4]. See also, Sundry Electors v. Key, Case XXVIII, 10th Cong., Cl. & H. El Cas. 24, 233 (1808)(Key inhabited Maryland on the day of election and only habitation and not residency is required so he was qualified to be a congressman); Campbell v. Davidson, 233 F3d 129, 1235 (10th Cir. 2000)(Colorado's rule requiring that candidates be registered voters in the district is unconstitutional); Schaefer v. Townsend, 215 F. 3d 1031, 1036, 1039 (9th Cir. 2000) ("The Framers discussed and explicitly rejected any requirement of in-state residency before the election. The Records of the Federal Convention show that the Framers intended to preclude any further requirement of residency prior to the date of election. . . . we hold that because California's residency requirement as it applies to candidates for the United States House of Representatives handicaps a class of candidates and falls outside the sphere of Elections Clause cases."); Tex. Democratic Party v. Benkiser, 458 F.3d 582, 589 [10](5th Cir. 2006)(following removal to federal court, Tom DeLay is not ineligible to run for Congress or be a congressman because he moved his residency to another state because the qualifications listed in the Qualifications Clause of the Constitution for Congress "may not be changed or expanded in any way by the states").

Thus, because the residency is not *material* to qualification, it cannot be a valid objection.

**THE NOMINATION STATUTE IS UNCONSTITUTIONAL AS APPLIED**

Title 25, Section 2937 of the Pennsylvania Election Code sets forth a strict process for challenging nomination petitions. The state process must be followed unless it is unconstitutional, and the court must take a careful look if the First Amendment is at stake. Rogers v. Corbett, 468 F.3d 188, 191 n. 5 (3d Cir. 2006).

Respondent alleges that the state process truncates the 1st Amendment right of access to courts and voting, and due process under the 14th Amendment by (a) setting forth a signatures collection deadline that is actually impossible for the average *pauperis* candidate to collect, (b) unfairly denying *pauperis* standing and refusing court directed delivery of subpoenas in nomination trials to *pauperis* candidates by imposing facts that do not exist in an effort to help the objecting party and eliminating a poor candidate's ability to solicit a defense, (c) refusing to give candidates a priority over all other cases as the statute expressly requires which denies a fair chance to prepare a defense, and denying a jury as well. In other words, denying federal standards of due process under the guise that "voting" is special.

**(a) An Impossible Deadline For The Average Indigent**

First, the deadline to collect names is near-impossible for all candidates who wish to challenge anyone wealthy including the sitting Republican congressman. It requires 1,000 good signatures collected in 20 days. This respondent went to every house on every day from sun-rise to sun-set and has personal knowledge of the voter habits and time required.

Competent and healthy voters do not return from the day's employment until 6pm during the nomination period which the legislature set as the worst part of winter (February 17 to March 9). When it starts to get dark at 7pm, they do not come to the door. Only their dogs do. This respondent was on school track teams. He has a history of running and did so from house to house and discovered it is impossible to collect even half of the required 1,000 in one hour a day, over 20 days because in that one hour only half sign the nominators will sign - the rest of the Democrats are upset at the President and slam the door. Because of this deadline, 8 Democrats announced their run including 2 who had run for Congress before and knew how hard it is, but failed to collect the right number of names, and could not file a petition.

This Respondent is poor, as the *pauperis* application shows. He cannot pay to hire people or amass resources like canvassers as another candidate can in order to meet the deadline. Therefore, the state deadline discriminates against this Respondent because he is poor and in the process denies him the 1st Amendment right to run for that public office, and denies his nominators the right to vote for him. This does not challenge the right of a state to require signatures. Instead, this challenges the short *deadline* that makes it impossible for poor candidates even if it were not in the worst blizzard season in decades, to meet a deadline that cannot fairly be met. This circuit has already ruled that a Pennsylvania state rule that discriminates against the poor by making poor candidates pay a filing fee of $200 which prevents them from getting on the ballot, violates the 14th Amendment:

> He had a personal savings account of $1,500 . . ..
> The statutory scheme at issue tended to "deny some voters the opportunity to vote for the their choosing, while simultaneously giving affluent voters . . .

> the power to place on the ballot. . . the names of persons they favor. [W]e conclude that the difficulty in raising the funds to pay the required fee, looked at in the light of the total assets of the candidate . . . and to expend funds needed to pay ongoing living expenses and prior legitimate debts is sufficient to demonstrate financial hardship. . . . The challenged fee structure fell with unequal weight on voters as well as candidates, according to their economic status.

Belitskus v. Pizzingrill, 343 F.3d 632, 642, 644, 646 (3d Cir. 2003).

That is what happened here: only affluent Tea Party Republicans are helped because the Republican Congressman can pay for dozens of canvassers to collect signatures. In governors' cases where deadlines were addressed and allowed, indigency was not an issue. So they cannot govern here.

Belitskus , supra, was based on the High Court holding poverty can be a suspect class, and ruling that a state rule that impairs a 1st Amendment right against a suspect class, can only be permitted in ways that are "narrowly tailored" to eliminate the least amount of the 1st Amendment right as possible. Hadley v. Alabama, 409 U.S. 937, 939, 93 S.Ct. 245, 246, 34 L.Ed.2d 190, 191 (1972) (dissent); Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)(state poll tax unconstitutional because it discriminates against the poor who cannot pay it as a qualification to vote); Boddie v. Connecticut, 401 U.S. 371, 381, 91 S.Ct. 780, 787 , 28 L.Ed.2d 113, 121 (1971)(state rule that gives indigent litigators less rights than those who can pay and refusing to admit them to the court, is unconstitutional); Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971)(a city ordinance violates the equal protection clause as to poor residents by a rule that allows them to automatically change a fine to a jail term solely because the defendant was poor and could not pay the fine because there are other means that could be used that do not punish indigency); Johnson v. Del. County, 34 Pa. D. & C. 23 (1938)(state rule requiring an indigent Candidate to pay a $20 candidate fee when township candidate filing fees were only $2, was unconstitutional).

But the High Court also warned in Harper, supra, at 668, 1082, 173, that when it comes to voting, the degree of interference is actually immaterial and even "narrowly tailored" intrusions are not allowed, because *any* restriction based on the wealth of the person in the voting process is arbitrary and capricious as a matter of law: "Wealth, like race, creed or color, is not germane to one's ability to participate intelligently in the electoral process. . . . to introduce wealth . . . as a measure of a voter's qualification is to introduce a capricious or irrelevant factor".

Thus, the issue *here* is not whether it is impossible for *all* persons to meet the deadline as happened to 8 candidates in Erie, but whether the deadline commonly restricts *poor* candidates from exercising their right to run for office because it only allows the wealthy in money or resources to continue. This Respondent is so poor that he could not even pay the rent that the candidate was able to pay in Belitskus, supra. He had to move out of his rented room in Sharon after he was given word that the Objector filed an objection in Harrisburg so he could pay for gas to get to Harrisburg to see the Objection because the Objector did not mail one to Respondent. Respondent had to give up a necessity of life: a warm room to sleep when the weather was below freezing outside, just to look for what was filed because the statute compels a hearing in days, not months. And Respondent could pay for canvassers to fan-out and collect

1,000 names for one hour period for 20 days.

Thus, a state's interest in making short deadlines that routinely kick poor candidates and denies voters the exercise of the 1st Amendment or forces a collection names of those who are so old that their signatures are different, does not out-weigh the rights of the candidate or the nominators. Anderson v. Celebrezze, 460 U.S. 780, 806, 103 S.Ct. 1564, 1578, 75 L.Ed.2d 547, 799 n. 26 (1982)(a write-in chance for missing a nomination deadline with a major party "is not an adequate substitute for having the candidate's name appear on the printed ballot" . . . so the interests of voters to express their support for the candidate outweighs any state interest in maintaining its candidate filing deadlines because the state "has a less drastic way of satisfying its legitimate interests" . . . and "may not choose a legislative scheme that stifles the exercise of fundamental personal liberties').

That means this Respondent was forced to go to homes all day long when the aged and infirm were the only ones there, and hundreds of them could not sign without help: they had strokes and heart attacks and their signatures changed, many had cataracts and could not see the lines, many were in a bed in the front room permanently and could only muster the strength to sign their name and promise they would vote for Mel but little else. And few of the signatures of the aged can match those they provided decades earlier to election offices. That, then, forced this Respondent to seek subpoenas of *recent* signatures from state welfare and DOT offices of the infirm nominators to show the person signing the nomination page was the right person even if the original voter registration signature from 1966 is different. But the Commonwealth Court refused to issue or serve those requests, and this Respondent could find no candidate in any challenges who has ever been allowed to use other state lists to prove authenticity of signatures even though the Evidence Code permits it. Pennsylvania Rules of Evidence 901 (b)(3) and (7)(A) (comparison with state records filed elsewhere), Commonwealth v. Gipe, 169 Pa. Super. 623, 84 A.2d 366 (1951) (comparison of typewritten document with authenticated specimen), Pa.R.E. 902, 42 Pa.C.S. § 6103 (official records within the state) and 75 Pa.C.S. § 1106(c) (certificates of title). They are forced to rely on old county records that are bad.

So, the state statute actually denies *all* candidates the rights of other civil litigants to subpoena state records that the Evidence Code permits, to match signatures, just to "streamline" nominations.

**(b) Unfairly Denying *Pauperis* Standing And Refusing Court Directed Delivery**

Additionally, when Respondent learned that *some* objection was filed against his nomination, he moved for *pauperis* standing and asked the court to issue and deliver the subpoenas to the state offices so that they could collect 600 recent signatures to prove the 600 challenged by the Objector are valid, by the trial date that 25 P.S. § 2937 fixes as no later than 15 days after the Objection is filed.

The Commonwealth Court refused, and did so by fabricating facts that do not exist in an effort to cripple Respondent's effort to prepare. (Respondent does not ask the federal court to address the error of the state court on IFP in violation of *Rooker-Feldman* because a new IFP submission here is not barred by that denial in the state under Denton v. Hernandez, 504 U.S. 25, 112 S.Ct. 1728, 1734 (1992)(denial of IFP application by prior court is not a judgment on the merits, and may not be used in that manner).) Instead, Respondent asks the federal court to

conclude that the IFP denial is part of an unfair process of "getting-rid of" attempts of a candidate to defend himself in time.)

First, the court assumed Respondent has tax returns he could have filed and because he did not file them with the motion, it was denied. But Respondent submitted a financial form to show that he has not made enough money to pay tax and that he is well below the poverty line of 10 years ago. Martinez v. Kristi Kleaners, Inc., 364 F.3d 1305, 1307 n. 5 (11th Cir. 2004) (applying Adkins and federal poverty guideline at $8,860 per year, and remanding to district court for failure to give reasons why IFP was denied since plaintiff was close to the poverty limit and probably had debt payments that the court did not ask about); Thompson v. Mazo, 421 F.2d 1156, 1158 n. 1 (D.C. Cir. 1970) (Adkins does not require destitution before IFP will be granted). In fact, this Respondent did not file in come tax returns this year or last because he did not reach the poverty level to require it.

Second, the court imposed another fact: that Respondent has bank statements that prove he made money during the time that he testified he did not. So the judge expects perjury: he demands the Respondent submit something that does not exist because Respondent's bank account was closed months ago for lack of funds for months. Moreover, a similar Respondent skeletal motion for IFP was granted by the Commonwealth Court in a different action without the proof that the new judge demands. The opposing party did not oppose the *pauperis* status: the judge merely raised an opposition to help the Objector. That suggests bias by the judge. Collins v. Experian Credit Reporting Serv., No. 3:04CV1905, 2004 U.S. Dist. LEXIS 26345, at * 7 (D. Conn. Aug. 24, 2005)(if the court finds information to help a party that a party could assert but did not, he acts as a party's advocate, and not as an impartial adjudicator); Khan v. Gutsgell, 55 S.W.3d 440, 441 n. 1 (Mo. App. 2001)(a court as an impartial arbiter cannot be an advocate for a party that declines to argue its own issues).

Finally, it took until the end of the first week after the filing of the Objection for the judge to make that order, but the judge then assumed Respondent could collect these non-existent bank statements and also move to waive subpoena fees and service costs a second time the following week. But by then it is too late for any state actors to either find 600 names or print their recent signatures because the same judge also ordered the Respondent to submit his proof of signatures by April 8 to allow them into trial on April 10. No employee in the state could do it in one day. So the state court issues orders that take weeks to receive and act on, knowing only 5 days are available. In fact, the state judge's order to deny IFP without prejudice to resubmission was sabotage because he knew the state statute gives no time to resubmit. The state statute as applied imposes the impossible.

Respondent also moved to continue or re-set the trial to allow the collection of those 600 *recent* signatures from state offices, but the court denied at the end of the 3rd week, April 3. Because the state statute prevents due process, Respondent comes to federal court to get it.

**(c) Refusing To Follow The Statute Requiring Priority For Candidates**

Additionally, while that state court offered instant electronic filing to the Objector so save the Objector time and allow him to see the same day what is filed and avoid days of waiting for the mail that eat-up the time before trial, it denied that same luxury when Respondent applied.

The statute says plainly that the court must "give such [election] hearing precedence over other business before it". 25 P.S. § 2937. But when respondent discovered that the electronic filing was available, he tried at the end of the first week after filing the objections to open such an account so he could see the objections and study them, but he was denied. Nor was he allowed to reach the "help desk" because the clerk merely said the system is "down" and had to wait until next week. The next week Respondent tried again and actually spoke with the "help desk" clerk Lisa to get it running because it did not work when Respondent tried, but it still did not start. When Respondent told her, she only said it takes several days for them to get around to making it active because there are plenty of people in line for it. When Respondent reminded her that it is an election case and they are supposed to have priority over other cases, she refused that priority. When Respondent called and asked if the Chief Clerk can impose that priority so Respondent can get papers without losing days in the mail with only one week left just to get motions and orders, the clerk refused to transfer the call and said the Chief Clerk does not control what its clerks do. They also admitted that they do not even file stamp all the submissions filed by Objectors so they did not know if a list of objections and names was filed or not and could not produce it.

*This* is why no prior candidate has ever introduced evidence from recent state records to show the signatures are valid and are forced to rely on 2 decades-old signatures on file in the county voting offices: the statute does not give enough time for any candidate to fairly find evidence because it would take weeks for the state officers to collect 600 names but the statute "as applied" allows only days and does not even allow enough days to receive and act on papers that Objectors file before trial.

No one can do more than this Respondent to try, but the court's refusal to give the priority to election cases that the statute mandates means that "as applied" it violates the due process and equal protection rights of this Respondent to prepare a defense for the only hearing allowed and denies him a fair exercise of the 1st Amendment right to run and his nominators' right to vote for him, and denies the 14th Amendment right of due process to collect evidence he needs and form a fair defense.

DATE: April 7, 2014

[signature]

Friday
March 28,
2014
2 sections 24 pages
Sharon, Pennsylvania
60 cents

The Herald
SERVING THE SHENANGO VALLEY AND MERCER COUNTY AREA FOR 149 YEARS

...merly of Wheatland.
Irma Mildon, 95, formerly of South Ninth Street, Sharpsville.

display Thursday during the National Guard Open House
service.

# ...ded ...ceipts

## Local lawmakers' expenses

Expense claims for meals and lodging in 2013 by area lawmakers:

**HOUSE OF REPRESENTATIVES**

Rep. Michele Brooks, Jamestown, R-17th District – $13,665

Rep. Mark Longietti, Hermitage, D-7th District – $8,835

Rep. Dick Stevenson, Grove City, R-8th – $13,246

**SENATE**

Sen. Robert D. "Bob" Robbins, Salem Township, 50th District – $11,059

*SOURCE: State House and Senate*

MERCER COUNTY

# Democrats challenge Marin's petition

By Keith Gushard
*Meadville Tribune*

The nomination petition of a Democratic candidate running for Pennsylvania's 3rd Congressional District is being challenged by the head of the Mercer County Democratic party.

Mel Marin, 60, of Sharon, is one of two Democrats seeking the party's nomination in the May 20 primary for the district that includes Mercer County.

The dis-

Marin

See PETITION, page A-2

# INDEX

Annie's mailbox ........A-12
Ask Dr. Komaroff ........A-11
Business ........A-8
Classified ........B-4
Comics/horoscopes ........B-9
Community ........A-10
Corrections ........A-2
Crossword ........B-7
Jumble ........B-7
Lotteries ........A-2
Obituaries ........A-5
Opinion ........A-4
Public notices ........B-6
Religion ........A-6
Sudoku ........B-9
Sports ........B-1
TV grid ........B-5
Weather ........A-2

# Brighten up the corner

"In the best of times, our days are numbered anyway. So it would be a crime against nature for any generation to take the world crisis so solemnly that it put off enjoying those things for which we were designed in the first place: the opportunity to do good work, to enjoy friends, to fall in love, to hit a ball, and to bounce a baby."

Alistair Cooke

*Submissions for Brighten Up the Corner may be e-mailed to: brightenup@sharonherald.com Please include your name, phone number and town of residence.*

...rmitage

Sharon Regional Health System
*Dedicated to caring for our community.*
740 East State Street • Sharon, PA
www.sharonregional.com

0 78908 22240 4

Cold front
Warm front
Stationary front
Showers
T-storms
Rain
Flurries
Snow
Ice
Miami
82/7
Shown are noon positions of weather systems and precipitation. Temperature bands are highs for the day.

## National Summary

Showers and thunderstorms will reach from the Gulf Coast to the Northeast today. Snow will fall on northern New England and the northern Rockies. More rain is in store for the Northwest.

# LOTTERIES

**PENNSYLVANIA**
**Thursday**
**Daily number:** 276, 407
**Big 4:** 1910, 0544
**Quinto:** 81527, 07090
**Treasure Hunt:** 4, 7, 15, 21, 26
**Cash 5:** 2, 3, 5, 31, 41
**Match 6:** 4, 8, 10, 24, 38, 49

**OHIO**
**Thursday**
**Pick 3:** 330, 493
**Pick 4:** 3653, 4982
**Pick 5:** 65030, 29053
**Rolling Cash 5:** 11, 19, 20, 22, 24

□□□

**Wednesday**
**Powerball:** 28, 33, 41, 44, 59; **powerball:** 21; **power play:** 2

*For more lottery information and previous numbers, contact the state lottery commissions: Ohio, www.ohiolottery.com, 800-589-6446; Pennsylvania, www.palottery.com.*

Daniel J. Boots, 39, and Heather R. Boots, 34, both of looked for electronics and she looked for jewelry, police Feb. 28 burglary in the 6900 block of Lamor Road.

# Winter

## Winter overtime ate up $3,900 over budget

*from page A-1*

"They're shorthanded too," Cave said of PennDOT.

Looking ahead to next winter, Cave said he'll be working with City Manager Scott Andrejchak to find ways to improve snow removal in the downtown shopping district, where high piles of melting snow interfered with parking.

"We're thinking about using a Bobcat to load snow into trucks so we can haul it out if we have to," he said. "We try to do what we can to help the businesses out."

Plowing snow costs a lot of money for wages and overtime, fuel and materials, said Ken Griffith, finance director for both the city and Sharon Sanitary Authority. He keeps track of the city budget.

"On a seasonal basis from November to March we were about 27 percent over budget for overtime," he said. "We'll have to watch carefully but that only amounts to about $3,900 so I don't think we'll have to cut any corners as we move ahead."

The city never ran out of salt, but supplies throughout the region ran short in February. Cities and towns had to wait until suppliers could catch up with demand.

Sharon got its final two deliveries late and received them within the last 10 days, Griffith said.

Late snow is part of life in western Pennsylvania. There could be more plowing but Cave said his crews have turned to their seasonal spring work – filling potholes.

# Petition

## Democrats challenge Marin's petition

*from page A-1*

trict includes all or part of Erie, Crawford, Mercer, Lawrence, Butler, Clarion and Armstrong counties.

Charles Rice, chairman of Mercer County Democratic Committee, has filed an objection with the Pennsylvania Department of State, which oversees elections.

Rice is challenging whether Marin has at least the minimum 1,000 valid signatures from registered Democrats within the district. Rice wants to remove Marin from the May 20 primary ballot.

"We think there are some duplicate signatures," Rice said Tuesday.

Attempts by The Herald to contact Marin for comment on Thursday were unsuccessful.

Commonwealth Court will hear Rice's challenge to Marin's signatures at a hearing at 9:30 a.m. April 10 in Pittsburgh.

Two years ago, Marin's name was removed from the 2012 primary ballot for the Democratic nomination for the 3rd District after a Commonwealth Court Judge ruled Marin didn't have enough valid signatures necessary for his petition.

Marin and fellow Democrat Daniel C. LaVallee of Cranberry Township, Butler County, are vying for the party's nomination in the May 20 primary. The winner is expected to face incumbent Republican Mike Kelly of Butler in the fall. Kelly is unopposed in the primary race for the Republican nomination.

*To report an error, call The Herald's news desk at 724-981-6100.*

## Reaching The Herald

www.sharonherald.com
*52 S. Dock St., Box 51*
*Sharon, Pa. 16146*

**Business hours:**
8 a.m. to 5 p.m. weekdays

**Phone:**
724-981-6100
or toll-free in Ohio and western Pa.:
800-981-1692

**After hours:**
Dial any extension to talk or leave voice mail, or press these general numbers:
1. – Circulation 4. – Photo
2. – Newsroom 5. – Obituaries
3. – Sports 6. – Advertising

**◆ LATE OR MISSING PAPER**
You should receive your Herald by 6 a.m. weekdays and 7 a.m. weekends. If you don't, call the circulation department:
■ **Weekdays 6 to 8 a.m.**
■ **Saturdays 7 to 10 a.m.**
■ **Sundays 7 to 11 a.m.**

**◆ TO ADVERTISE**
Call 724-981-6100 for:
■ **Classified** (person-to-person, help wanted, auto, real estate)
■ **Retail** (display advertising)
**Advertising fax:** 724-981-7844

**◆ THE NEWSROOM**
**Phone:** 724-981-6100
**Newsroom fax:** 724-981-5116
Extensions:
Business ......243 News tips ......232, 247
Community news ...241 Obituaries ......248
Corrections ....232, 247 Police, courts ..232, 247
Internet/website ......300 Religion ......234
Editorials ......230 Sports ......250, 251

March 28, 2014
2 sections 24 pages
Sharon, Pennsylvania